UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-00395-TJK |
| EMANUEL JACKSON, | |
| Defendant. | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Emanuel Jackson to 46 months' incarceration, the low point of the Guidelines range, three years of supervised release, restitution in the amount of $2,000, and a $100 special assessment fee.

### I. INTRODUCTION

The defendant, Emanuel Jackson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Jackson, then a twenty-year-old high school student, participated in two violent clashes with police. First, he repeatedly punched a U.S. Capitol Police ("USCP") officer while entering the U.S. Capitol through the Senate Wing Door at approximately 2:48 p.m. After exiting the U.S. Capitol, Jackson remained on the Capitol grounds and joined the crowd of rioters at the "Tunnel" in front of the Lower West Terrace Doors. There, at approximately 4:50 p.m., Jackson repeatedly struck multiple Metropolitan Police Department ("MPD") officers with a metal baseball bat.

The government recommends that the Court sentence Jackson to 46 months of incarceration for violating 18 U.S.C. §§ 111(a) and (b). A 46-month sentence reflects the gravity of Jackson's conduct, but also acknowledges his early admission of guilt and mitigating circumstances.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense in this case for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Jackson's Role in the January 6, 2021 Attack on the Capitol

*Approach to the Capitol*

Jackson, a resident of Washington, D.C., attended the "Stop the Steal" rally on January 6, 2021. He then marched with other protestors to the Capitol.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Jackson wore a black hooded sweatshirt, a tan military-style backpack, and a light blue surgical mask on his face.



*Image 1: Jackson at the Capitol on January 6.*

### *The Mob's Breach of the Capitol Building and Jackson's Entry into the Capitol*

At about 2:00 p.m., Jackson was part of a mob of violent protestors that climbed stairs on the west front of the U.S. Capitol building near the Senate Wing Door. Rioters began striking the windows and doors of the U.S. Capitol. Dozens of USCP and MPD officers who were in police uniform attempted to restrain the crowd but were eventually overwhelmed.

At approximately 2:48 p.m., the large crowd that was being restrained by police overpowered the officers and gained entry to the Capitol building through the Senate Wing Door. Jackson was one of the first individuals who entered the doorway and went inside the Capitol.

As shown below in Exhibit A and Image 2, Jackson made a fist and repeatedly struck a U.S. Capitol Police officer on his person while attempting to forcefully enter the building by pushing through the doorway.

3



*Image 2: Screenshot of Exhibit A at 00:26 showing Jackson (circled in red) repeatedly punching a USCP Officer.*

Jackson forcefully entered the building by pushing through the doorway. He then moved a piece of broken furniture on the ground and yelled at officers. *See* Exhibit B at 00:15-00:49.

4



*Image 3: Screenshot of Exhibit B at 00:39 showing Jackson (circled in red) pointing and yelling at officers.*

Jackson then stood by the Senate Wing Door and ushered in other rioters, often by gesturing or touching the rioters' shoulders. See Exhibit B at 00:55 to 01:49.

After traveling to the Crypt, Jackson exited the building at approximately 3:24 p.m. through the window next to the Senate Wing Door.

### Jackson's Assault of Officers in the Tunnel

After leaving the Capitol building, Jackson moved to the West Terrace, where rioters were confronting police. At approximately 4:50 p.m., the most violent and aggressive rioters, some of whom were armed with weapons, assaulted police in the entranceway. The officers deployed plexiglass riot shields for protection.

Jackson repeatedly struck a group of uniformed MPD officers with a metal baseball bat. *See* Exhibits C, D and E.

5



*Image 4: Screenshot of Body Worn Camera in Exhibit C at 00:10 showing Jackson beating officers with the baseball bat.*

Jackson reached into the Tunnel and held the bat with his right hand as he swung it in a chopping motion.



*Image 5: Screenshot of Surveillance Footage Inside the Tunnel in Exhibit D at 00:02 showing Jackson (circled in red) reaching into the Tunnel above the officers' heads to hit them with the bat from above.*

Jackson swung the bat and hit the officers and the shields more than a dozen times. *See* Exhibit D. He stopped when he was sprayed with pepper spray. *See* Exhibits E and F.

### *Jackson's Statements*

In a video posted to Instagram immediately after Jackson was in the Tunnel, Jackson said he had a bat and got pepper sprayed in his eye. Exhibit F at 00:03-00:25. He said he was there "fighting for America." Exhibit F at 00:25-00:41.

On January 18, 2021, Jackson voluntarily entered the First District MPD station and admitted to taking part in the violent protest and perpetrating the violent conduct described above. Exhibit G. Jackson explained that he turned himself in because he saw his photo in the images circulated by the FBI looking for individuals involved in the riot. Exhibit G at 16:02-16:35.

Jackson said that he took a bus to Gallery Place, went to the rally, and then joined people walking toward the Capitol. *Id.* at 16:45-53, 17:43-18:35. Jackson said that he saw the fences were down, which he commented was odd, and then he saw people climbing up and joined them. *Id.* at 16:54-17:14. To gain entry to the Capitol, he said "everybody pushed in and got inside." *Id.* at 17:20-17:43. He said people behind him were pushing and he participated in the pushing to get into the Capitol. *Id.* at 23:15-23:56. He first said he didn't remember striking any officers, but then said a few batons were coming his way as people were pushing in so he might have struck officers. *Id.* at 23:56-24:32.

Jackson identified himself in photos and videos from January 6. *See, e.g., id.* at 19:30-20:00, 22:35-22:55, 23:40-50.

7



*Image 6: Screenshot of Exhibit G at 41:00 showing Jackson identifying himself in photos.*

Jackson explained that he found a baseball bat and used it with the goal of pushing forward knocking the police shields out of the way. *Id.* at 20:00-20:35.

In the interview, Jackson admitted that his purpose was to enter the Capitol and to stop the vote count of the Electoral College as it met to certify the results of the 2020 Presidential Election. *Id.* at 38:13-44.

On February 11, 2021, Jackson participated in a video debrief meeting with his counsel, an FBI agent, and prosecutors. He said he attended the rally on January 6, 2020, and then went to the Capitol because then President Trump said to go. Jackson said he did not think any violence would take place. He admitted to punching an officer. He said he was upset when he found a bat on the floor, broke down, and blacked out. Jackson said he "shouldn't have attacked none of them." He said he was upset at the officers, but now his "anger should be directed at politicians" and didn't "want to hurt politicians."

8

## III.     THE CHARGES AND PLEA AGREEMENT

On June 10, 2021, the government filed an Information charging Jackson with three counts: Obstructing or Impeding Certain Officers, in violation of 18 U.S.C. §§ 111(a)(1) and (b); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); and Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1). On December 18, 2024, Jackson is expected to plead guilty to that offense pursuant to a plea agreement.

## IV.     STATUTORY PENALTIES

Jackson now faces sentencing on Obstructing or Impeding Certain Officers, in violation of 18 U.S.C. §§ 111(a)(1) and (b).

As noted by the plea agreement the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case, because of Jackson's personal use of violence.

9

As set forth in the plea agreement, the parties agree that the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Total | 26 |

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 34. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 23, *see* PSR ¶ 29 n. 3, Jackson's Guidelines imprisonment range is 46 to 57 months' imprisonment.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Jackson's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Jackson's troubling conduct was extremely serious. He was at the front of the crowd when rioters breached the Senate Wing Door and struck an officer to force his way into the building. His actions contributed to the rioters' success in overrunning the officers and breaching the Capitol building. His actions escalated when he grabbed a baseball bat, swung it more than a dozen times in the Tunnel, and struck officers. The nature and circumstances of

Jackson's offense were of the utmost seriousness, and fully support the government's recommended sentence of 46 months of incarceration.

### B. The History and Characteristics of the Defendant

Jackson, a 24-year-old man, is a lifelong resident of the Washington, D.C. metropolitan area. PSR ¶¶ 40, 44-45. At the time of the offense, Jackson was a twenty-year-old high school student. PSR ¶ 54.



Jackson has no criminal history. PSR ¶ 34. He has been compliant with his conditions of pretrial release. PSR ¶ 5.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law.

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Jackson's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to specifically deter Jackson from committing similar crimes in the future also weighs heavily in favor of a lengthy term of incarceration.

On January 6, Jackson made a series of choices. He chose to join the front line of rioters attempting to enter the Senate Wing Door of the Capitol. When he saw a group of officers trying to prevent the rioters from entering, he chose to make a fist and punch a U.S. Capitol Police Officer. He then chose to usher in other rioters. When he left the Capitol building, he chose not to go home, but to stay on the Capitol grounds and go to the Tunnel where rioters were assaulting officers. He

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

then chose to pick up a baseball bat and strike officers repeatedly with it. The government requests a sentence to deter Jackson from ever again making the choice to engage in violent conduct.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Jorden Mink*, 21-cr-25-RDM, the defendant was also armed with a baseball bat and assaulted police officers in the Tunnel. Mink did not use the bat to assault officers, but his violent conduct in the Tunnel was comparable to Jackson's. Mink threw several objects at the officers, including a traffic cone, a stick, and another object. Mink then violently and repeatedly struck officers with a pole. Judge Moss sentenced Mink to 51 months' incarceration. Whereas Jackson also committed assault at the breach at the Senate Wing Door, Mink also committed Theft of Government Property, in violation of 18 U.S.C. § 641, for using a bat to break a window and removing chairs and other property from the Capitol so they could be used by other rioters as weapons. Jackson also warrants a lower sentence than Mink because Mink had extensive criminal history.

Other defendants using similar weapons to assault officers in the Tunnel have been sentenced comparably. For example, in *United States v. Josiah Kenyon*, 21-cr-00726-CJN, the defendant used numerous weapons to attack officers in the Tunnel, including a pylon and a table leg with a protruding nail. Judge Nichols sentenced Kenyon to 72 months' incarceration. Kenyon's

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

crimes were worse than Jackson's. Kenyon pled guilty to two charges of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) for two different officers, and Kenyon inflicted bodily injury on both officers.

The instant case is most comparable to *United States v. Devlyn Thompson*, 21-cr-461-RCL. In that case, the defendant assaulted an officer with a police baton while on the Lower West Terrace, threw a large box speaker at a line of police officers, and stayed in the area of some of the most vicious assaults for multiple hours. Thompson pleaded guilty to violating 18 U.S.C. § 111(a)(1) and (b). Judge Lamberth sentenced Thompson to 46 months' imprisonment. Jackson, however, also assaulted an officer when he breached the Senate Wing Door and facilitated the entry of other rioters into the building. Much like Jackson, Thompson approached law enforcement officials immediately when he learned that the FBI was looking for information about him and accepted his guilt early. In sentencing Thompson, Judge Lamberth considered his mild diagnosis of autism spectrum disorder, which his defense counsel argued at sentencing made him "uniquely vulnerable to what was going on on the Capitol grounds that day." *Thompson*, Dec. 20, 2021 Sent. Tr. at 12-14, 29.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

16

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Jackson must pay $2,000 in restitution, which reflects in part the role Jackson played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Jackson's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 81.

---

18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

17

## VIII. FINE

Jackson's conviction for violating 18 U.S.C. § 111(a)(1) and (b) subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Jackson's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Jackson claims he has never held a paying job and has no assets. He is unlikely to become able, to pay a fine.

## IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 46 months' incarceration, the low point of the Guidelines range, three years of supervised release, restitution in the amount of $2,000, and a $100 special assessment fee.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   */s/ Sarah W. Rocha*
SARAH W. ROCHA
Trial Attorney
D.C. Bar No. 977497
601 D Street NW
Washington, DC 20579
Telephone:   202-330-1735
sarah.wilsonrocha@usdoj.gov